UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 11-10294-GAO |
| | ) | |
| DAVID A. KEITH | ) | |

MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS EVIDENCE

**INTRODUCTION**

Defendant, David Keith, moves, pursuant to the Fourth Amendment of the United States Constitution and Fed. R. Crim. P. 12, to suppress the fruits of the September 17, 2010 search of his residence at 1 Marshland Street, Haverhill, Massachusetts. The search resulted in the seizure of computers and various other digital media, and engendered statements by Keith when interrogated by law enforcement during the search.

The gravamen of the probable cause set forth in the search warrant affidavit was an image from a “cybertip” provided to law enforcement by the National Center for Missing and Exploited Children (“NCMEC”). The cybertip provided by NCMEC was actually collected by Internet Search Provider (“ISP”) America On Line (“AOL”) using software that probes email traffic to cull images it suspects to be contraband. AOL then forwarded an alert to NCMEC that included email addresses of the sender and intended recipient. In so doing, AOL acted as an instrument of law enforcement and its warrantless churning of email traffic for

contraband was illegal.

Even if the Court concludes that AOL was acting as a private entity when it searched defendant’s email traffic for content and seized items it deemed suspicious, NCMEC’s opening and viewing of the email attachments supplied by AOL was an expansion of AOL’s search, which in the absence of a warrant was illegal.

Whether or not lawfully obtained, the cybertip image and additional information in the warrant affidavit only established probable cause to believe, at best, that a computer and associated digital media possibly containing child pornography had been present at 1 Marshland Street at some point in the past. Probable cause to search Marshland Street for a computer and related items, however, ended by July 29, 2010 when Keith delivered his computer to a Staples store for repair where it remained up to and through the date of the search. Where the search warrant did not, and could not, allege any evidence of subsequent internet activity at 1 Marshland Street or any evidence that Keith had purchased or was using another computer there, the information was stale and did not support a finding of nexus between the items to be seized and the place to be search that was required for a search at 1 Marshland Street on September 17, 2010.

The good faith exception does not save the search because a reasonably prudent officer would have know that the warrant was

defective where it was based on an image provided in a cybertip and the lack of nexus between the place to be searched and items containing child pornography was patent.

Finally, the statements made by Keith when put in custody as result of the search directly flowed from the illegality and thus must also be suppressed notwithstanding the fact that he had been provided Miranda warnings.

For any and all of these reasons, the Court must suppress the items seized from 1 Marshland Street as well as admissions made by Keith to law enforcement during and in connection with the search.

## STATEMENT OF FACTS

### 1. Background

On November 27, 2009, NCMEC received a complaint through its "Cyber Tipline" from AOL relating the transmission of an email containing an alledged child pornographic image ("CP") the previous day. A copy of the November 27, 2010 "NCMEC CyberTipLine Report" (hereinafter "cybertip") is attached hereto as Exhibit A. The cybertip was sent to NCMEC by AOL accompanied by an image file that had been culled by AOL, which AOL had flagged as possible child pornography.[1] The filename associated with the image at issue was "12yo preparing to enter.jpg." The

[1]AOL's role in culling email for content for inclusion in cybertips to NCMEC, as well as its methods for doing so, is described more fully in defendant's suppression argument infra.

email sender was identified as “amanda175069@aim.com.”

NCMEC is a government funded, supported, and directed non-governmental organization that exists for the purpose of, inter alia, generating investigations and prosecutions of illegal pornography. It receives funding from the Office of Juvenile Justice and Delinquency Prevention under the umbrella of the Office Justice Programs within the U.S. Department of Justice. As NCMEC puts it,

> NCMEC plays an important role in helping law enforcement with on-going investigations. The Case Analysis Division assesses missing children leads gathered from investigating agencies or NCMEC’s Call Center. The Case Analysis Division provides direct analytical assistance to law-enforcement working on active or long-term, missing-child cases. Using NCMEC databases, external sources, and geographic information databases, this Division tracks leads, identifies patterns among cases, and helps coordinate investigations by linking cases together.

National Center for Missing and Exploited Children, 2010 Annual Report, available at http://www.missingkids.com/en_US/publications/NC171.pdf.

Personnel from numerous law enforcement agencies including the FBI, ICE, United States Marshals Service, United States Postal Inspection Service, Department of Defense, and Military Criminal Investigation Organizations work out of NCMEC headquarters. United States Department of Justice Report to Congress, National Strategy for Child Exploitation Prevention and Interdiction, August 2010, at pp. 46, 84-91, available at

http://www.projectsafechildhood.gov/docs/natstrategyreport.pdf. According to its website, NCMEC's Board includes the President of the Fraternal Order of Police, the Assistant Director of FBI's Criminal Investigative Division, the Director of the U.S. Marshals Service, the Executive Associate Director of Homeland Security Investigations, the Chief Postal Inspector, the Director of U.S. Secret Service, the Executive Assistant Director for Criminal Investigations for NCIS, and the Acting Director of ATF. Significantly, as explained in more detail infra, NCMEC's Board of Directors is chaired by John D. Ryan, Chief Counsel of AOL's Public Safety and Criminal Investigations division.

A few days after the cybertip was received by NCMEC from AOL, the image contained in it was opened by NCMEC personnel, viewed, and noted to be "child pornography unconfirmed." Exhibit A at p. 5. As AOL's culling of email content appears to be automated, NCMEC's action in opening and examining the file appears to be the first time that the image content was actually viewed.

In the weeks that followed the November 27 cybertip, law enforcement personnel and staff at NCMEC investigated the physical location of the owner of the "amanda175069@aim.com" address using administrative subpoenas to AOL, and later, Verizon. After determining that the Internet Protocol (IP) address for the email account associated with the cybertips was

assigned to an address in Massachusetts, NCMEC contacted the Massachusetts State Police (as well as other local Massachusetts authorities) to report the suspected criminal activity and the possible IP origin of the suspected email. While the investigation into the initial email continued, AOL forwarded an additional eighteen (18) cybertips to NCMEC that NCMEC later determined to be related to what was by then an ongoing investigation.[2] These cybertips were analyzed for IP origin as well. The last of the cybertips reported a suspect image file sent on April 19, 2010.

Five months after AOL submitted the initial cybertip to NCMEC, NCMEC forwarded the cybertip and associated image to Massachusetts State Police Trooper Michael P. Murphy, who began investigating by duplicating the NCMEC's efforts to obtain the physical location of the IP address, this time using state administrative subpoenas to Verizon, who owned the IP address at issue in the first cybertip. The result of Murphy's subpoenas was a customer name of Douglas Keith and a physical address of 1 Marshland Street in Haverhill, Massachusetts.

On September 16, 2010, nearly ten months after the original

[2]The majority of the suspected images associated with the eighteen subsequent cybertips were repeats of the image reported in the first cybertip. Of the images that were not duplicates of the original image, some were not child pornography at all. In any event, none of the subsequent images were described in the search warrant affidavit and so were not part of the probable cause analysis.

NCMEC cybertip and two months after obtaining the physical location of the IP address associated with it, Trooper Murphy learned that Plaistow, New Hampshire police Sergeant Patrick Caggiano had received independent information from employees at a Staples store regarding a laptop containing possible child pornography. According to a summary of an interview with the employees, the laptop had been dropped off for repair by the defendant on or before July 29, 2010, nearly two months before Caggiano's conversation with Murphy. Neither Caggiano nor the Staples employees viewed any images on the laptop; rather, their suspicions were aroused by the filenames viewed on the computer. Murphy also learned that on August 10, 2010 Caggiano interrogated the defendant, who admitted that the laptop dropped off at Staples was his and that he had seen and downloaded images of children as young as 8 years old engaged in sexual activity.

On September 17, 2010, Murphy sought and obtained a search warrant from Haverhill District Court authorizing a search of 1 Marshland Street for "computer systems, computer hardware, computer software, cellular telephones and any and all digital and analog media" as described in an addendum attached to the search warrant. The Search Warrant is attached hereto as Exhibit B. Trooper Murphy's Affidavit in Support of the Search Warrant is attached hereto as Exhibit C. A copy of Sergeant Caggiano's affidavit in Support of the Search Warrant for the Staples

laptop, which was appended to Murphy's Affidavit in Support of the Search Warrant, is attached hereto as Exhibit D.

**2. The Search Warrant**

The search warrant and its addendum specified the authorized search and particularized items to be seized during the search. Consistent with the investigation, the warrant authorized seizure of evidence in connection with violations of M.G.L. c.272 §29B and §29C, respectively dissemination and possession of child pornography under Massachusetts law, and limited seizure to digital devices, primarily computers and associated peripheral devices. Exhibit B at pp. 1-2.

**3. The Search Warrant Affidavit**

Trooper Murphy's affidavit is sixteen pages long. Under the heading "Basis of Probable Cause," Murphy cites his belief that

> probable cause exists that evidence of the crime of Dissemination of Visual Material of Child in State of Nudity or Sexual Conduct (MGL c.272 §29B) and the crime of Knowing Purchase or Possession of Visual Material of Child Depicted in Sexual Conduct (MGL c.272 §29C) will be found in the computer system and computer media devices of the suspect, David Keith (DOB: XX/XX/XX), at 1 Marshland, MA [sic]. My conclusion is based on the information contained in the following paragraphs.

Exhibit C at p. 4 of 16 (emphasis supplied). The "following paragraphs" relate the details of the investigation described supra. Exhibit C at pp. 5-7 of 16. The only alleged pornographic image described in the affidavit is the image culled by AOL and forwarded to law enforcement through NCMEC in the

first cybertip.

Murphy's affidavit includes a reference to the affidavit of* Plaistow Sergeant Caggiano in support of the New Hampshire warrant, which detailed the July 29 discovery and seizure of the defendant's laptop at the Staples store there, as well as Caggiano's subsequent interrogation of, and admissions by, the defendant. Exhibit C at pp. 6-7 of 16; Exhibit D at p. 4. Murphy relates that the Staples laptop had been forensically analyzed and a "partial report" completed just before he applied for the search warrant. Exhibit C at 7 of 16. The partial report disclosed the following:

- online chat messages discussing possible abuse of a specific minor living in the defendant's home; and
- a photograph of unknown date and provenance of the defendant "and in the background of the photograph is a computer monitor and other computer equipment.

Exhibit C at 17. The partial report contained no description of any pornographic images from the Staples laptop; indeed, it made no mention of contraband being found on the computer at all.[3]

The remaining paragraphs aver why and how evidence of child pornography possession and dissemination would be discovered on a computer, and the means by which it could be forensically

[3]Murphy's affidavit does not purport to rely on the discovery of any child pornography on the Staples laptop. Indeed it cannot; according to Caggiano's affidavit, neither the Staples employees nor Caggiano himself ever viewed any child pornography on the Staples laptop, opting instead to submit it directly for forensic analysis.

extracted from a computer once seized by investigators. Exhibit C at pp. 7-15 of 16.

**4. <u>The Search</u>**

On September 17, 2010, just moments after it had been obtained, local, state, and federal law enforcement agents executed the search warrant. As directed, they seized a computer and other digital devices from the home. A copy of the Search Warrant Return is attached hereto as Exhibit E.[4] In the course of executing the search, Murphy and other law enforcement agents interrogated the defendant and confronted him with evidence derived from a "forensic preview" conducted during the search. A copy of Trooper Murphy's affidavit in support of a criminal complaint, which includes a summary of the interrogation on page 4, is attached hereto as Exhibit F.[5] During the course of the interrogation the defendant admitted to possessing and viewing child pornography on his computer, as well as sending it by email to others. <u>Id.</u> He was arrested.

A subsequent forensic examination of the two computers

---

[4]The Search Warrant Return, which was filed one week after the search, lists two computers seized during the search. The first, a Gateway brand computer, was seized on September 17, 2010 while law enforcement agents were at the home. The second computer, a Hewlitt Packard brand computer, was seized three days later by local law enforcement, apparently in further execution of the warrant, after the defendant's grandparents alerted law enforcement to a second disused computer in the home.

[5]The interrogation was also audio-recorded.

seized as a result of the search warrant allegedly revealed images of minors engaged in sexually explicit activity. The defendant was charged in federal court with the instant indictment, which alleges distribution, possession, and accessing child pornography.

## ARGUMENT

### I. KEITH HAD A PRIVACY INTEREST IN HIS EMAILS TRANSMITTED USING AOL, AND WHERE AOL WAS ACTING AS AN INSTRUMENT OF LAW ENFORCEMENT PURSUANT TO THE STATUTORY FRAMEWORK ESTABLISHED BY CONGRESS, ITS SEIZURE AND FORWARDING OF THE EMAILS TO NCMEC FOR LAW ENFORCEMENT ACTION WAS A VIOLATION OF THE FOURTH AMENDMENT

#### A. The Fourth Amendment Protects the Privacy Interests in Email

Email is now ubiquitous and indispensible in modern society and has largely replaced the more venerable mode of the United States Postal Service, searches of which are constitutionally designated "presumptively unreasonable." United States v. Jacobsen, 466 U.S. 109, 114 (1984). Like postal mail, email is passed by entrusting delivery of words, documents and files through an intermediary such as AOL, an ISP. Courts have thus begun to address and recognize the subjective and objective expectation of privacy in the content of email communications. See, e.g., United States v. Forrester, 495 F.3d 1041, 1050 (9th Cir. 2007)(distinguishing examination of email addresses, which are not constitutionally protected, from more intrusive searches which reveal content information).

Congress has similarly recognized the fundamental expectation of privacy in email content by establishing statutory protection through the Electronic Communications Privacy Act ("ECPA"). See 18 U.S.C. §§ 2701 et seq. The ECPA generally addresses access to stored electronic communications flowing through services such as ISPs, and sets forth the prerequisites for disclosure of information to third parties (including law enforcement). See 18 U.S.C. § 2703. With only a few limited exceptions, an ISP such as AOL is barred from disclosing information about electronic communications without a court order, warrant, or consent of the customer. Id. The principal exception is for specific identifying data (subscriber name, physical and digital addresses, length of service, means of payment and session times or durations), which may be disclosed when the governmental entity uses an administrative, grand jury or trial subpoena. 18 U.S.C. § 2703(c).

Without the consent of the user, disclosure of the content of an email always requires formal process (a court order or warrant), which may issue only upon a finding of some quantum of individualized suspicion. In providing greater protection to the "contents of [an] electronic communication" than to "[r]ecords concerning electronic communication service[s]," 18 U.S.C. § 2703 (b) & (c), Congress has codified what courts have concluded and logic dictates is a manifestly reasonable expectation of privacy

in email content. Thus, an ISP user such as the defendant has a constitutionally protected Fourth Amendment interest in his email, an interest which was violated when AOL targeted and culled email communications for forwarding to NCMEC, a law-enforcement affiliated entity.

**B. AOL's Churning and Seizure of Email Is Done in Conformity With Statutory and Regulatory Directives That Have the Practical Effect of Making AOL an Instrument of Law Enforcement**

It is axiomatic that the Fourth Amendment applies to constitutional intrusions by government, rather than private, entities. Jacobsen, 466 U.S. at 113. The Fourth Amendment, however, also protects against unreasonable searches and seizures by private individuals or entities acting as 'instruments or agents' of the Government. Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971)). A search carried out by a private party in conjunction with government efforts may no longer qualify as a private search immune from the Fourth Amendment. United States v. D'Andrea, 648 F.3d 1, 10 (1st Cir. 2011). While the Fourth Amendment does not ordinarily provide protection against searches by private individuals acting in a private capacity, the government's role in instigating an intrusion and its control over the party making the intrusion may transform the ostensibly private search into de jure governmental violation of the constitutional prohibition against unreasonable searches and seizures. United States v. Silva, 554 F.3d 13, 19 (1st Cir.

2009). A statutory or regulatory scheme that clearly compels a private actor to take specific steps that further an enforcement goal will turn a private entity into a law enforcement instrument for Fourth Amendment purposes. Skinner v. Railway Labor Executives Assn., 489 U.S. 602, 615-16 (1989).

Here, there is no question that AOL's culling of email content from the defendant's email traffic impinged on this constitutional expectation of privacy in email content. AOL lauds its "extremely effective technologies to identify and remove images" from email, which directs that if it "identifies that someone is attempting to send a [suspected contraband] through its network . . . AOL prohibits the sending of that file and refers that image to [NCMEC]. . . . [T]his procedure provides law enforcement with all of the information they require to initiate an investigation while insuring that a child is not re-victimized."[6] John D. Ryan, Chief Counsel, Public Safety and Criminal Investigations, AOL LLC, Written Testimony to Congress

---

[6]In a United States v. Richardson, 607 F.3d 357 (4th Cir. 2010), discussed infra, the Fourth Circuit quoted an AOL description of one of the several methods by which it searches email content, its Image Detection and Filtering Program ("IDFP"). "IDFP recognizes and compares the digital 'fingerprint' (known as a 'hash value') of a given file attached to a subscriber's email with the digital 'fingerprint' of a file that AOL previously identified as containing an image depicting child pornography. . . . [I]f the IDFP detected a match suggesting that an email transmission contained child pornography images, then AOL notified the NCMEC as required by [now 18 U.S.C. § 2258A]." Id. at 362-63.

(attached hereto as Exhibit G). The procedure describes a search and seizure of email content that would be impermissible absent a warrant supported by probable cause. 18 U.S.C. § 2703. The sole question, then, is whether in so searching and seizing such content AOL is performing a governmental search. Review of the statutory scheme compelling the search and seizure of email, and the scheme's relationship to AOL's churning of email and its referrals to law enforcement, inevitably leads to the conclusion that it is.

Section 2258A of Title 18 is entitled "[r]eporting requirements of electronic communication service providers and remote computing service providers" and mandates that ISPs that discover evidence of child pornography must report the information by way of cybertip. 18 U.S.C. § 2258A(a)(2)(A). The statue requires, in turn, that NCMEC forward the report to such law enforcement agencies as have been designated by the Attorney General. 18 U.S.C. § 2258A(c). Although the statute recites a lack of intent to require ISPs to monitor their users' content, see 18 U.S.C. § 2258A(f), it also sets forth fines of up to $300,000 for ISPs that were found to have willfully failed to make a report. 18 U.S.C. § 2258A(e). Finally, a parallel statutory provision provides immunity to ISPs for actions relating to the "performance of the reporting or preservation responsibilities" under the statute as long as the actions were

undertaken in good faith. 18 U.S.C. § 2258B(a) & (b). As thus broadly written, the immunity appears to cover an ISPs' efforts to discover violators, i.e., searching content to discover evidence of child pornography, so that reports could be made in compliance with the statute.

Congress conferred additional protections and incentives to ISPs to screen internet traffic for obscene material. The Communications Decency Act of 1996 ("CDA"), codified at 47 U.S.C. § 230, was enacted in part to help "ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity . . . by means of computer," and confers civil immunity to providers of interactive computer services (ISPs) for "any action voluntarily taken in good faith to restrict access to . . . material that the provider or user considers to be obscene . . .." Id. This statutory provision immunizes ISPs for the implementation of screening software. See E360insight, LLC v. Comcast Corp., 546 F.Supp.2d 605 (ND Ill. 2008); Langdon v. Google, 474 F.Supp.2d 622 (Del. 2007).

The First Circuit has identified factors such as "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests" as relevant to the determination of whether an

ostensibly private intrusion into a constitutionally protected privacy interest turns into a de jure government search, thus triggering the protections of the Fourth Amendment. Silva, 554 F.3d at 18 (citation omitted). Even where the government has not explicitly compelled a private entity to perform a search, its “encouragement, endorsement, and participation" in the search may may rise to a level that implicates the Fourth Amendment. Skinner, 489 U.S. at 615-16 (1989). Accord United States v, Momoh, 427 F.3d 137, 141 (1st Cir. 2005)(instigation of a search, which includes “affirmative encouragement,” “coercing,” “dominating,” or “directing” an individual or entity, constitute evidence of governmental involvement sufficient to implicate Fourth Amendment protection). The Silva factors as informed by the Supreme Court’s Skinner teachings compel the conclusion that in churning through the content of the defendant’s email AOL was acting as an agent of the government.

Congress’s regulatory entrance into the field of ISPs and email content, as outlined above has produced a result substantially identical to the drug testing regulatory scheme of the Federal Railroad Safety Act that was at issue in the Supreme Court’s Skinner decision. In Skinner, the Supreme Court looked at regulations enacted pursuant to 45 U.S.C. § 431, which, though not compelling drug testing on the part of a rail operator, made reporting drug test results to the Federal Railroad

Administration mandatory. Id. at 607-11. Noting the fact that the railroad regulations at issue (1) pre-empted state law, (2) gave the Government to right to receive the evidence collected voluntarily by the railroad, and (3) forced the railroad to remove the employee from the regulated part of their job if they refused the request to be tested, the Court found that the Government had encouraged and endorsed the testing sufficient to implicate the government action triggering Fourth Amendment protection. Skinner, 489 U.S. at 615-16. Skinner thus stands for the proposition that rather than merely being aware of or acquiescing in the private conduct, when the Government actively encourages, facilitates, or otherwise participates in the private search or seizure, its participation triggers Fourth Amendment protections regardless of the private party's intentions. Id.

Like the FRA regulations at issue in Skinner, the child pornography reporting statutes do not make screening email traffic for CP mandatory, but they mandate reporting any known violations for the purpose of initiating criminal investigations. They grant immunity to an ISP for both reporting CP and screening for obscene content. Both statutory schemes preempt state law that might otherwise restrict an ISPs' authority to assist the authorities in these ways, which has the effect of removing all legal barriers to searching for CP. Finally, as the regulations in Skinner did, Congress has held out the threat of sanction for

non-compliance - here substantial fines if an ISP is found to have failed to make a report - which would predictably motivate ISPs to perform due diligence in the interception of email traffic and search for illicit content. With the path to search cleared as it is by Congress, an ISP would run a substantial if not certain risk of criminal sanction if it exhibited willful blindness to contraband on its network by failing to proactively search all email traffic for content to ferret out suspected child pornography.

The statutory scheme of 18 U.S.C. § 2258A and 47 U.S.C. § 230 makes clear that the government is far more than merely aware of, or simply acquiescing in, AOL's search of email content. Rather, Congress' actions constitute a unitary program to deputize the ISPs in its fight against pornography and seek their assistance in ferreting out the suspected content in ways that its own law enforcement agencies could not do.

Not surprisingly, the statutory scheme has devolved to the de jure participation of ISPs, particularly AOL, as government investigating instruments. On August 23, 2006, NCMEC announced that a number of ISPs, including AOL, were cooperatively participating in a "Technology Coalition" in order to launch an aggressive new campaign to fight child exploitation on the

Internet.”[7] According to NCMEC, the Technology Coalition is to be “funded within NCMEC to develop and deploy technology solutions that disrupt the ability of predators to use the Internet to exploit children or traffic in child pornography.” Id. It is to “actively support[] law enforcement efforts to track down predators, find[] new technological solutions, and participat[e] in industry-wide initiatives.” Id.

AOL’s immersion in NCMEC’s law enforcement mission is especially striking. AOL’s Legal Counsel, who spearheads AOL’s Criminal Investigations arm, holds the concomitant role of Chairman of the Board of Directors of NCMEC. In his role spearheading criminal investigations for AOL, Ryan has boasted that AOL “provides training and pre-trial litigation support to prosecutors and law enforcement officers” and “maintains a 24-hour dedicated law enforcement hotline.” Exhibit G (Ryan Testimony) at p.4. According to Ryan, the statutory scheme underlying what is now § 2258A, which codifies NCMEC’s enforcement role as data collector and analysis center, grew out of and were modeled on AOL’s practices. Id.

Ryan’s statements to Congress make crystal clear that after the enactment of the statutory scheme that is now embodied by 18

---

[7]NCMEC’s press release announcing the Technology Coalition is available at http://www.missingkids.com/missingkids/servlet/NewsEventServlet?LanguageCountry=en_US&PageId=2629.

U.S.C. § 2258A and 47 U.S.C. § 230, the mission, goal, and practices shared by AOL and NCMEC are identical and driven by a law enforcement purpose, thus satisfying the First Circuit's test for agency in the Fourth Amendment context. Silva, 554 F.3d at 18-19 (factors to be consider include extent of government role in instigating or participating, government intent and degree of control it exercises over the private party, and extent to which the private party aims primarily to help the government or to serve its own interests). Because AOL's actions in culling email is intertwined with government law-enforcement affiliated NCMEC's own efforts, the government is an active participant in AOL's search and seizure of email content and thus the search of defendant' email is subject to Fourth Amendment protections. Skinner, 489 U.S. at 615-16.

Thus, read in a commonsense fashion, the statutory scheme of § 2258A, despite its disclaimer that it should not be construed "to require an [ISP] the monitor any user, subscriber, or customer," 18 U.S.C. § 2258A(f), constitutes "affirmative encouragement," "coercing," "dominating," or "directing" AOL's efforts. Momoh, 427 F.3d at 141. That coercion, and the unitary law-enforcement endeavor to search it has engendered, implicates the Fourth Amendment. Skinner, 489 U.S. at 614-15. Because the Fourth Amendment dictates that a search without a warrant is unreasonable, and none was obtained to search the content of the

defendant's email, the evidence contained in the November 30, 2010 cybertip and any evidence derived from it must be suppressed.

Two courts have reached a different conclusion. In United States v. Richardson, 607 F.3d 357 (4th Cir. 2010), the Fourth Circuit distinguished the statutory scheme mandating content reporting in pornography cases from the Skinner scheme of mandatory drug testing. Richardson, 607 F.3d at 367. To the Richardson court, the lack of specific direction under § 2258A and the statute's disavowal that the statute intended monitoring of email communication were material differences between § 2258 and the Supreme Court's Skinner concerns over the Federal Railroad Safety Act regulations. Id. The Fourth Circuit also rejected Richardson's argument that the provision for fines within the predecessor to § 2258A served to compel search and seizure of contraband images, reasoning that the fines created a commercial self-interest to search and seize rather than government deputation to investigate. Id. at 367.

In United States v. Cameron, 729 F.Supp.2d 418 (D.Me. 2010), appeal docketed, No. 11-1275 (1st Cir. March 15, 2011), Judge Woodcock evaluated a similar argument regarding Yahoo!'s seizure of suspected contraband. Relying in large part on Richardson, he ruled that Yahoo! was not an agent of the government for Fourth Amendment purposes. Id. t 424. Judge Woodcock rejected the

argument that Yahoo!'s participation in the NCMEC-lauded Technology Coalition and development of a law enforcement compliance guide conferred agency status. Id. He reasoned:

> Admittedly, there is some governmental involvement in the Technology Coalition, including funding, and the Compliance Guide suggests that Yahoo! has elected to cooperate with governmental authorities in the fight against child sexual exploitation. However, Yahoo!'s membership in the Technology Coalition is voluntary, required neither by the Government nor by § 2258A. Although Yahoo!'s actions are undoubtedly meant to help the Government discover and investigate child pornography crimes, at the end of the day, Yahoo!'s self-interest and the Government's law enforcement interests coincide; Yahoo! and the Government seek to prevent Yahoo! customers from using its services to commit crimes against children.

Id. From this, Judge Woodcock concluded that Yahoo! acted in commercial self-interest in searching rather than by government mandate. Id.

This Court should decline to follow Richardson and Cameron, for two reasons. First, both decisions put undue weight on the tautologically reasoned conclusion that ISPs act in commercial self-interest, rather than at the behest of the government, when they engage in the practice of searching for contraband. Richardson, 607 F.3d at 367; Cameron, 729 F. Supp. 2d at 424. It is precisely the point of the statutory scheme to make it unacceptably unpalatable for those companies in the ISP business not to search content. An act compelled by the government to avoid the specter of criminal sanction is necessarily in the ISPs' commercial self-interest; it does not follow, however, that

the government is not coercing, dominating, or directing the self-interested search. Silva, 554 F.3d at 19. But in any event, the Supreme Court's Skinner decision stands for the proposition that the government's encouragement, endorsement, and participation in search efforts may rise to a level where the private entity's purportedly independent initiative to search becomes meaningless. Skinner 489 U.S. at 615. Such is the case here: the statutory scheme as practiced in an ISPs' search for suspect email content is riddled with government participation, and the Richardson and Cameron decisions fail to recognize or even address this central tenet of the Supreme Court's teachings.

Second, neither the Richardson nor Cameron courts had the benefit of considering the Ryan testimony outlined above, which demonstrates beyond all doubt the inextricably intertwined efforts that result in what is in practice a unitary law-enforcement endeavor far exceeding the "some governmental involvement" cited by Judge Woodcock in regard to Yahoo! in 2007. Cameron, 729 F.Supp.2d at 424. Similarly, the Ryan tesimony constitutes evidence of the agency relationship between the government and AOL found lacking in the Richardson decision. See Richardson, 607 F.3d at 365 ("there is little evidence in this record upon which to demonstrate the existence of a de facto agency relationship between AOL and the Government").

In sum, the government compels the search of email content

by AOL, and when AOL searches for that content it acts as an instrument of the government to conduct a search that the government could not do on its own. Skinner, 489 U.S. at 614. The results of that search cannot be countenanced as evidence and must be suppressed.

## II. EVEN ASSUMING, ARGUENDO, THAT AOL WAS ACTING AS A PRIVATE ENTITY WHEN IT SEARCHED FOR CONTENT AND SEIZED ITEMS IT DEEMED SUSPICIOUS, NCMEC'S SUBSEQUENT VIEWING OF THE EMAIL ATTACHMENTS WAS AN EXPANSION OF THE PRIVATE SEARCH THAT WAS IMPERMISSIBLE IN THE ABSENCE OF A WARRANT

As evidenced by Exhibit A, NCMEC conducted an evaluation of the image contained in the November 27, 2009 cybertip, the image that became the gravamen of the search warrant affidavit. See Exhibit A at p. 5. NCMEC's examination and evaluation occurred after and was wholly apart from AOL's submission of the cybertip. Where AOL's submission of the cybertip was likely the result of a software program which forwarded suspected contraband while stopping short of actually viewing and evaluating the image itself, NCMEC personnel's action in opening and evaluating the image constituted a government expansion of AOL's initial search. Such an expansion is impermissible absent a warrant and therefore NCMEC's action in evaluating the image without first seeking a warrant violated the Fourth Amendment. The evidence must therefore be excluded.

In Walter v. United States, 447 U.S. 649 (1980), the Supreme Court considered whether law enforcement, once lawfully in

possession of evidence delivered to it by a private entity, could further impinge on a defendant's expectation of privacy by expanding the search without first obtaining a warrant. Id. at 651. In that case, employees of a private entity received and opened a package mistakenly delivered to it and discovered individual boxes of film suggestive of sexually explicit conduct. Id. at 652. They opened the packages, but were unable to determine the content of the film inside. Id. The employees then forwarded the film packages to the FBI, who viewed the films and determined they were obscene. Id.

The Supreme Court held that the FBI's viewing of the films, even though it had lawful possession of them, was illegal absent a warrant. Id. at 654-55. This was so because the owner's privacy interest in the contents was not extinguished despite the fact that the film had been provided to the FBI by a private, third-party entity. Id. at 657. See D'Andrea, 648 F.3d at 8 ("it is clear that just because a private party violates a person's expectation of privacy does not mean that the expectation of privacy no longer exists or is not reasonable"). The FBI's subsequent viewing of the content represented "a significant expansion of the search by [the] private party and therefore must be characterized as a separate search" that could only be supported by exigency or a search warrant. Walter, 447 U.S. at 657.

Even assuming AOL’s search of the defendant’s email traffic was a private (rather than government-compelled search), see supra, NCMEC’s opening and viewing of the suspected contraband significantly expanded AOL’s search. AOL’s search and seizure appears to be accomplished by means of software that identifies and culls file attachments with “unique digital signatures from apparent pornographic images of children” which it then forwards to AOL. Exhibit G (Ryan Testimony) at p. 3. See also Richardson, 607 F.3d at 362-63 (describing AOL’s Image Detection and Filtering Program). All indications are that the process is accomplished automatically, without viewing of the content of the suspected contraband files by AOL personnel. See Exhibit A (November 27, 2009 cybertip). The cybertip strongly suggests that, at least as to the instant cybertip, NCMEC’s procedure is for its staff to perform a confirmatory examination once it receives the automatically generated cybertip from AOL, an examination that necessitates opening and viewing the file for content. Id.

Thus, even assuming arguendo that AOL was performing a private function rather than government search when it culled the defendant’s email, NCMEC’s affirmative viewing of the actual image once it was forwarded to its staff is exactly the kind of expansion of the search prohibited by Walter. As in Walter, the fact that NCMEC may have received the cybertip and been in

possession of the image lawfully is of no moment. Id. at 658. As the government was required to secure a warrant before viewing the films in the boxes lawfully provided to it in Walter, so too the government here should have obtained a warrant before permitting NCMEC personnel to open and view the images provided to it by AOL, regardless of whether NCMEC was lawfully in possession of the file or not. Id. at 657. The government did not, and thus the evidence of the content of the image must be suppressed. Where the gravamen of the search was the description of the image unlawfully viewed, the warrant to search 1 Marshland Street was unlawfully obtained and the evidence and statements flowing from it must be suppressed.

## III. THE AFFIDAVIT FAILED TO PROVIDE A SUFFICIENT BASIS TO BELIEVE THAT A COMPUTER OR OTHER DIGITAL DEVICE CONTAINING CHILD PORNOGRAPHY WOULD BE FOUND AT MARSHLAND STREET ON SEPTEMBER 17, 2010.

"'A warrant application must demonstrate probable cause to believe that (1) a crime has been committed–the "commission" element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called "nexus" element.'" United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005), (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)). With regard to the "nexus" requirement, the judicial officer must decide that, given the circumstances indicated in the four corners of the search warrant affidavit, there is a fair probability that evidence of a crime will be found in the place

to be searched. Id., at 86-87; United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009). The nexus between the items to be seized and the place to be searched is essential to a finding of probable cause. E.g., Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Stripped of its rote recitations regarding child pornography profiles and the use of digital devices, the gravamen of Trooper Murphy's affidavit is that (1) a person accessed an IP address physically located at 1 Marshland St. to send an image suspected to be child pornography in November 2009, and had perhaps continued to send an image or images from 1 Marshland St. until as late as April 19, 2010, five months before Murphy submitted the search warrant affidavit, and (2) the defendant lived at 1 Marshland during that time period and admitted to downloading and viewing child pornography. These facts were insufficient to establish a nexus that would support probable cause for the search for and seizure of digital devices on September 17, 2010.

Most critically, the information purporting to provide a nexus to digital devices containing child pornography at 1 Marshland St. on September 17 was stale. In assessing a staleness claim, the court "must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir.

2008); see also United States v. Reiner, 500 F.3d 10, 15 (1st Cir. 2007). Here, the nature of tje information is undisputed, and establishes that no later than July 29, 2010 - six weeks before the application for a search warrant - the defendant's computer, suspected to contain child pornography, was out of commission and in the hands of law enforcement officials. There is absolutely no information in the affidavit of additional cybertips or any other suspicious activity after that date, and no indication whatsoever that the defendant had replaced or attempted to replace the Staples laptop. Thus, the existence of a computer or digital device containing child pornography at 1 Marshland Street on September 17, when law enforcement was in possession of a computer defendant identified as his did not rise to probable cause based on reliable information; instead, the existence of the purported objects of the search warrant at the place to be searched was nothing more than pure speculation.

Perhaps recognizing the absence of a nexus on September 17, the affidavit refers a picture of unknown date and provenance recovered from the Staples laptop purporting to show the defendant "and in the background of the photograph is a computer monitor and other computer equipment." Exhibit C at p. 7, ¶ 12. Murphy goes on to make the conclusory assertion that his "training and experience" allowed him "to reasonably conclude" from the presence of the computer monitor and other undescribed

equipment that a computer separate and apart from the Staples laptop existed Id. Notably, the affidavit is silent concerning the absence of a computer processing unit (such as a tower or other device) in the picture relied upon.

Murphy's conclusory assertion not only does not follow from any specialized training and experience, it is just wrong. Laptops are now (and have been) ubiquitous and serve a variety of functions, including operating as a replacement for tower-style computer processing units. They can be and are routinely attached and detached from larger systems that include monitors and other peripheral devices. Thus, the existence of a monitor in a picture is of almost no, if any, probative support for any conclusion that another computer must necessarily exist and consequently Murphy's assertion is entitled to no weight in the probable cause analysis. Vigeant, 176 F.3d at 571 ("[U]nsupported conclusions are not entitled to any weight in the probable cause determination.").

In any event, any probative value of a picture of the defendant in front of a computer monitor is eviscerated by the fact that there is no date, time, location, or other indicia connecting the picture to 1 Marshland St. and/or to the time of the search to support the crucial nexus prong of probable cause.

In sum, while there may have been a nexus between suspected evidence of criminal activity and 1 Marshland Street in April

2010 when there was demonstrably a digital device sending suspected contraband at that location, by September 2010 that nexus was gone. The information supporting a nexus finding completely evaporated once law enforcement had seized the Staple laptop and had no further information about suspicious activity or even the presence of a computer in the home. Zurcher, 436 U.S. at 556 ("The critical element in a reasonable search is not that the owner of the property is suspected of a crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). The paucity of information supporting the existence of a computer or other digital device at 1 Marshland St. on September 17, 2010 renders the search warrant invalid and the fruits of it must be suppressed.[8]

---

[8]As noted supra, Murphy discusses in his affidavit the recovery of an online chat from the Staples laptop suggesting an instance of abuse from several years in the past and investigator attempts to identify the possible victim and whether he continued to live at 1 Marshland. See Exhibit C at p. 7 of 16, ¶ 12. The discussion of the possible past abuse in the affidavit is puzzling. There is no suggestion in the affidavit that any of the items sought to be seized - computers and other media - are evidence of any offense related to that possible abuse. Indeed the affidavit specifically focuses the scope of any evidence to be seized on violations of MGL c.272 §29B and § 29C, respectively dissemination and possession of child pornography, and there is absolutely no information alleging that these offenses were any way connected to the years-past abuse. Consequently, the material is irrelevant to the probable cause determination and its inclusion surplussage.

Putting aside its irrelevancy, the chat information culled from the Staples laptop is itself suppressible as its culling exceeded

## IV. THE LEON GOOD FAITH EXCEPTION DOES NOT SAVE THE SEARCH

If this Court agrees that the warrant to search Keith's home was issued on the basis of illegally obtained evidence and/or without probable cause, the fruits of that search should be suppressed. The so called "good faith" exception recognized in United States v. Leon, 468 U.S. 897 (1984) does not rescue this unconstitutional search where the deficiency in the warrant "results from either (1) non-technical errors of a kind that a reasonably prudent officer would (or should) have recognized, or (2) law enforcement officers' acts or omissions of a kind that a reasonably prudent officer would have avoided." United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993). Nor does [it] apply where the warrant was supported by nothing more than tenuous and conclusory suggestions. Vigeant, 176 F.3d at 572.

Here, basing a warrant on the use of an image provided in a cybertip, compounded by the patent lack of nexus to 1 Marshland St. on September 17, 2010, are the kinds of errors a reasonably prudent officer would have avoided. Ultimately, no reasonably

---

the scope of the New Hampshire warrant authorizing the search of the laptop. See Exhibit D (Caggiano affidavit) at p. 2 (requesting limited authorization to search the Staples laptop for visual images, documents and data evidencing ownership and control, and computer access codes, passwords, and/or protocols). Should the government seek to rely on the chat material as supportive of probable cause to search 1 Marshland to obtain computers and other digital devices, defendant requests the opportunity to file supplemental briefing regarding the suppression of the chat material as well.

prudent agent could have believed that the affidavit demonstrated a sufficient nexus between the suspected activity of possession of child pornography and 1 Marshland St. on September 17, 2010. Accordingly, the government cannot meet its burden to show that the Leon good-faith exception applies. See Vigeant, 176 F.3d at 572-75 (concluding that government had not met its burden to prove good faith under Leon because no reasonable officer would have applied for a search warrant based on an affidavit with numerous omissions of material facts and "foundationless conclusions"), citing, inter alia, Ricciardelli, 998 F.2d at 16 ("Leon good-faith exception inapplicable where the shortcomings in probable cause were attributable to ‘the inspectors' omissions in the warrant-application process[]'")

**V. KEITH’S STATEMENTS WHILE IN CUSTODY DURING THE SEARCH MUST BE SUPPRESSED AS FRUIT OF THE ILLEGAL SEARCH**

The circumstances of Keith’s admissions to law enforcement makes clear that they were the unattenuated product of the search and the evidence obtained from it. Keith was taken into custody during the illegal search and the admissions made when confronted with the evidence seized. Because the admissions were a direct product of the search, the fact that Keith was advised of his Miranda rights is, under the circumstances, irrelevant. Brown v. Illinois, 422 U.S. 590, 603-604 (1975). Accordingly, the motion to suppress must be granted and all of the fruits, including Keith’s admissions, must be suppressed. Wong Sun v.

United States, 371 U.S. 471, 486 (1963).

**CONCLUSION**

For the foregoing reasons, the defendant respectfully moves that this Court suppress from evidence at trial items illegally observed or seized on September 17, 2010 from 1 Marshland St., Haverhill, as a result of the search warrant as well as statements made by him contemporaneous with the search and his arrest.

DAVID KEITH
By his attorney,

/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper St. 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 25, 2012.

/s/ Timothy G. Watkins
Timothy G. Watkins