UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DAVID A. KEITH, Defendant. | Criminal Docket No. 1:11-cr-10294-GAO-1 June 20, 2012 @3:30 p.m. |

MOTION HEARING

BEFORE: THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

John Joseph Moakley United States Courthouse
Courtroom No. 9
1 Courthouse Way
Boston, MA 02210

Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA 02210

APPEARANCES:

On Behalf of the Plaintiff:

United States Attorney's Office
(By: Suzanne M. Sullivan, Attorney at Law)
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3146

On Behalf of the Defendant:

Federal Public Defender
District of Massachusetts
(By: Timothy G. Watkins, Attorney at Law)
55 Sleeper Street
Boston, Massachusetts 02110
(617) 223-8061

P R O C E E D I N G S

THE CLERK: All rise. The United States District Court for the District of Massachusetts, the Honorable George A. O'Toole, Jr., presiding. We're here for the United States -- oh, please be seated. We're here for the United States versus Keith Motion Hearing, Docket No. 11-10294.

Can counsel please state their names for the record?

MS. SULLIVAN: Good afternoon, your Honor. Suzanne Sullivan on behalf of the government.

MR. WATKINS: Good afternoon, your Honor. Tim Watkins on behalf of Mr. Keith.

THE COURT: You might as well remain standing.

MR. WATKINS: I might as well. Your Honor, we briefed this pretty thoroughly including my response this morning.

As I've laid it out, and I think I would continue to lay it out, that there are three main issues. There's some subsidiary issues but three main issues. The first is whether AOL when it churns through the e-mail to locate files was executing a government function, and, in fact, searching that would require a -- which would be a violation of the Fourth Amendment without a warrant here, and that hinges obviously on whether AOL is a government instrumentality or agent when they do so.

The second issue would be whether if AOL turns over a document -- was performing a search but then turned that over to the National Center for Missing and Exploited Children, once they open it up and do the further analysis whether that is an expansion of the search which itself would also be a violation of the Fourth Amendment, an independent violation of the Fourth Amendment.

Finally, a separate issue from the churning and the acquisition of the e-mail was whether the search warrant established probable cause for a nexus to 1 Marshland Street in September given the kinds of facts that were in there, so those are the three large issues that I briefed, and briefed at some length.

As far as the churning of the e-mail that AOL does, I think the facts are largely undisputed, and the test that both the government and I seemed to agree on is the Silva test that the First Circuit set forth.

I think the only thing that we disagree on here is the government talks about nobody told AOL to do this, no agent, either generally or specifically in this case asked them to go through and churn the e-mails for suspected contraband. And really that is not what I'm arguing, what I've tried to argue here is that it is a statutory scheme of the reporting requirements for NCMEC and also the incentive for internet service providers like AOL to develop and employ software;

that that is where the governmental action becomes, and where inevitably it's going to result in any internet service provider necessarily having to employ these kinds of methods to find the content, and that's where the government's action would be and where I think it would begin, where it really would satisfy the test that is set forth in Silva.

And I think that while the government has suggested that or AOL continues to suggest that it is for some kind of business reasons, and, certainly, the affidavit is not particularly clear about what that business reason is. At the end of the day, I think the business reason is that AOL does not want to violate or come close to violating the statutory scheme that's been developed that requires child pornography to be reported to NCMEC, which is a law enforcement-affiliated organization.

It is -- as I've argued particularly in my reply today, it is always going to be a business decision to not violate the law, and I think at the end that is what AOL is trying to say in a variety of forums there. It talks about other business reasons, protecting its network, things of that nature.

The specific software that's talked about in this affidavit, I think, again, we all agree, as is present here is an image-filtering software that AOL has developed and

uses to find contraband that they are then going to turn over. That is not a kind of software that is going to detect threats to the physical structure of the system or bring it down some kind of malware, spyware, but rather this is specifically developed, as I read the affidavit and as I understand it through other case law, that identifies images that it will then cull and set aside to send to NCMEC.

So given that this software is not to protect the infrastructure or the general integrity of the system itself, what it really does come down to is: we don't want the stuff on the network because, indeed, it is illegal. And if that is what AOL is after, that is when they become a function of the government, given the kind of statutory scheme that is behind this.

THE COURT: There are cases involving carriers like FedEx who assert the same interest, and it's been recognized. In other words, even though FedEx is monitoring it, and, you know, opening packages that may yield contraband that the government's very interested in, the cases have recognized that FedEx has a business interest in not being a carrier of contraband, for example.

MR. WATKINS: I would argue --

THE COURT: How is this different?

MR. WATKINS: -- this is different because it is images. FedEx has an interest obviously in explosives and

dangerous material and all kinds of different things that would in fact represent a threat to the integrity of their employees and things like that.

THE COURT: How about methamphetamines?

MR. WATKINS: I'm sorry?

THE COURT: Methamphetamines being sent through packages. That doesn't threaten the delivery system itself directly, but it is something a company might legitimately say: why are we doing this?

MR. WATKINS: Absolutely, and they can legitimately say that; and with FedEx, I think the larger issue is that they carry all sorts of products and potential items in there. What we're talking about is strictly images, strictly identifiable kinds of content going through rather than something that is more lethal, for example, such as a bomb or anything else.

The larger principle is that FedEx gets to do that in those kinds of circumstances because it does have that identifiable larger interest in protecting its workers and its system. Subsumed in that, obviously, is to say, you know, if they open up those packages and let's say they find something else and they find methamphetamine, they turn that over to the government, that's fine; but this is a different thing where we're talking about specific images that, in fact, AOL finds or they say they know exactly what

they are and what the issue is, what they're looking for.

In other words, where a FedEx employee might go in looking for whatever he might want to look at; AOL's going specifically to look for things that is identified as contraband so it is, in effect, looking at a specific class rather than that greater whole that FedEx might look through, so I think it is a very different kind of search that AOL does here and that's where it makes the difference.

I think there's also the kind of statutory scheme here that is much more targeted towards AOL as an internet service provider than the interstate commerce kinds of regulations that might adhere to FedEx.

I haven't compared those. Obviously, I could take a look at that, but specifically in the child pornography context, it's very specific about what it is that the government is trying to get internet service providers to do here, and that is another difference between FedEx kinds of cases.

So, again, on that point I think that's what makes the case much more like the Skinner case rather than the FedEx kinds of cases where there is that kind of statutory scheme where they're targeting a specific thing, a specific item that they're getting at. In Skinner it was drug testing, and here it is the natural child pornography kinds of images that there becomes incentives/disincentives at the

same time that are inevitably going to result in some kind of search by --

THE COURT: In Skinner there was two kinds of regulations, one that was mandatory, part C I think it was, and then there was part D which was preparatory or permissive, I guess is a better way of saying it, which is this?

MR. WATKINS: Well, I think it's kind of both. There are two parts of it. There is a mandatory part of the statutory scheme, 2258A.

THE COURT: Reporting once you know?

MR. WATKINS: Reporting once you know, but the preparatory part or the ostensibly nominally preparatory part is we are going to shield you from any kind of liability for finding this stuff or invading other people's privacy if indeed you do go searching for this stuff.

That's where the incentive rather than the disincentive comes from, the carrot rather than the stick. So I think like Skinner both parts of that apply to an internet service provider when they look at the statute.

So, again, I briefed it at some length, and it's clear the Court has looked through all this and has an idea where we rely on this case law. Again, I don't think that there's that much disagreement factually about what's going on here. I think it's really how you call the law on it.

The second aspect is whether, even assuming AOL had some kind of ability to go in and find this matter as a private party, once they turn it over to the National Center for Missing and Exploited Children; and for the court reporter's benefit, I'm going start referring that by its acronym which is NCMEC, and further confuse things by calling it NCMEC; that would be the National Center for Missing and Exploited Children.

Once they get it, it appears to me from the affidavit and all the other discovery provided in the case that's appended to the motions, what NCMEC does at that point is open up what AOL has given them and begins to look at it and analyze it themselves and determine whether it's child pornography and determine what should happen next in law enforcement on it.

THE COURT: Can you perhaps be a little bit more specific about what you understand happens: AOL, let me tell you what I understand, and I don't know whether it's accurate or complete, but AOL identifies a file. I guess we'll call it a file. Is it proper to call it a file?

MR. WATKINS: Yes.

THE COURT: That is identified by a hash tag unique to it, and it identifies it by comparing it to a known value in its library of suspicious things.

MR. WATKINS: AOL seems to suggest that. They don't

come out and say that, but I think that is a fair inference from what they said.

THE COURT: So they identify a file by its name I guess we can call it a hash tag, and they then report to NCMEC: This is consistent with our records which indicate this may be child pornography?

MR. WATKINS: I don't believe they said anything about whether it's consistent or not. I think they simply send it as suspected contraband --

THE COURT: Okay.

MR. WATKINS: -- to NCMEC.

THE COURT: The statement may be implicit in the sense that its specific intent is that the reason that we're sending it to you is it's the same file we've got in our library, and we know it's child pornography.

MR. WATKINS: Certainly, NCMEC, when they would receive it, that's the inference that they would draw.

THE COURT: Here's an unopened file; I don't know what "unopened" means from AOL that comes in the door at NCMEC?

MR. WATKINS: That's correct, much like we might send a pdf between people, they will send an e-mail that includes that attachment with the hash value; that it doesn't have that hash value anymore, I think, but it is the one that they've identified as the hash value.

THE COURT: Well, I guess I don't know if any of these details are important or not; I'm just trying to understand. I guess that's what I'm -- does it have a different name?

The papers indicate that this file had a name which was somewhat descriptive of the content, but it wasn't clear to me where that came from and when in the process?

MR. WATKINS: It is not in the papers. I think I can say that that -- let me put this a better way: that would be the file name that was included in the original e-mail and attachment that was trying to be sent across AOL's server. And then when AOL looked at it against the hash tag, I do not believe the hash tag takes into account the name that's there. The hash tag is a long, I think 32 character number, and it is that that gets sent to NCMEC and I'm not -- I don't believe that the name goes with it. Although, I think it must at some point be part of that file that goes to NCMEC once --

THE COURT: My understanding was that AOL performs more or less an automated process. It's simply matching numbers; and then when they get a match, they pull it out.

MR. WATKINS: That seems to be what they're saying in their affidavit. They're also saying they don't get the hash values from anywhere else so at some point somebody has looked at this picture before at AOL and said: This

is contraband; this is the hash value on it; anything else we get of that is going to go to NCMEC.

But once it comes through NCMEC, they physically open -- not "physically," someone will look on that file to open it up, and the inference on that is you will see in the exhibits the reports from NCMEC talk about someone at NCMEC confirming whether it is child pornography or not, so it becomes clear that people at NCMEC are almost actually taking this file and opening it up and beginning to do some kind of analysis on it.

At the same time they're reverse engineering the IP addresses to find out where it came from, and that's when they make the law enforcement referral. I think I've stated that most accurately. I hope that answers the Court's question?

And that is my where I think the second Fourth Amendment violation occurs is: when NCMEC opens up that file to start doing more search of it, they're exceeding the search that AOL did of Mr. Keith's or, well, the e-mail attributed to Mr. Keith.

As the Court has said, this is an automated procedure that AOL sends this apparently unopened file, NCMEC opens it up, and they begin to do further analysis, and that is a further search I think as defined by Walters by then opening it up and doing more work on it.

In order to do that, I think NCMEC would need to have a warrant to say we have identified what we want opened up, and their failure to do that at that point is a violation of Fourth Amendment.

I do want to address on that issue, the government in its memo talked about NCMEC not being a private organization; thus, not subject to the Fourth Amendment. I think that's wrong. I just don't think that that is going to survive the kind of scrutiny. As I described there, I think it is beyond any doubt that where law enforcement officials are working at this organization, it's statutorily -- and it's part of the statutory scheme, it's named specifically as part of the statute as the clearinghouse for these law enforcement referrals.

I think truly it is a, for all intents and purposes, an agent or instrumentality of the government; I don't think there's any real issue there. So if indeed opening up a file is an expansion of the search, which I would argue it is, as a government agency they would be required to get a search warrant. Because they did not, that's where the second violation of the Fourth Amendment violation occurred, and that one requires suppression whether or not AOL is a private party. Although, again, I think it is quite clear and I've argued that, indeed, they are acting at the government's behest.

THE COURT: So just to be clear: it's your position, just focusing on this second step, if it is as you say a governmental search without a warrant, it would violate the Fourth Amendment; therefore, your argument is everything that follows is tainted?

MR. WATKINS: It is. That once that image, that particular image, that that is related to the first cybertip, and, actually repeated in the other cybertips. This is a case where this file was continually tried to be sent, continually got intercepted by AOL, and that's why there are these cybertips there. Not all of them have this image, but most of those cybertips have that particular image.

It's that image that is the basis of the search warrant where there's that violation before, and that is the central part of the search warrant, then the answer would be: yes, once that goes I think that the search warrant goes because there's certainly not any kind of independent information at that point about a file, a pornographic file, being downloaded.

The separate issue then is what I probably inartfully started calling staleness, and I'm not sure it's exactly staleness, but I hope I've been clear. Factually, what happens is that the computer, the Toshiba computer, which received these e-mail transmissions was in the shop some two months before the search started.

This gathering of information for this investigation took a period of time, and in addition that period of time seemed like perhaps -- well, it took a long period of time. By the time the warrant had been drawn up and the affidavit was there, the computer at issue was already out of Mr. Keith's hands, the computer that would be likely to have any kind of child pornography on it. Not only is it the one that's likely to have any kind of child pornography on it, but there's no evidence that there was another computer on that date in September when the officers actually chose to search here.

So it's really I think pretty straight forward, the government argues that because child pornography collectors maintain collections for periods of time that really any time one goes into a home once that's been identified, if they're there, you're okay. I don't think that is the law. I think there is still a requirement of a nexus to have criminal activity or evidence of criminal activity on the date that the search warrant is going to be executed.

That's lacking here. It simply isn't the case that there is probable cause to believe that a computer containing child pornography would be there on that day. One could certainly speculate, you know, he's probably going to buy a computer, maybe he's going to buy a computer, maybe there were other computers there, but that's exactly what it would

be is speculation, and that does not rise to the level of probable cause.

As I point out in my motion, there very well may have been probable cause in April of 2010 to execute that search warrant at 1 Marshland; there very well may have been probable cause to execute a search of the Toshiba laptop in September of 2010, but those two things together were lacking. There simply was not sufficient evidence before the issuing magistrate that a computer containing child pornography would be found on that date.

Those are my three main areas. There is the issue of the statements, but, again, I don't believe the statements survive given the context here. He was arrested at the scene because of this, what was found at 1 Marshland Street there. I think if the search goes, then the arrest was invalid, and the statements go.

It's not a Miranda issue. I didn't mean to argue that, but it's what the government responded to. As a practical matter, if the Court were to suppress here the physical evidence, this is not a case I believe that the government could go forward just on the statements without any kind of physical evidence, but certainly that's for down the road.

I've mentioned why I think Leon doesn't apply, and I think Ricciardelli applies very well here, that the search warrant on its face as far as the staleness on it and how

the image came to be on it, there is not some kind of technical mistake that the magistrate made or some kind of close nook, these were fundamental kinds of errors that a reasonable law enforcement agent would know about and any magistrate should have detected.

So for all those reasons, your Honor, we'd argue that the evidence should be suppressed, the statement following should also be suppressed.

THE COURT: Ms. Sullivan.

MS. SULLIVAN: Thank you, your Honor. As to the first argument the defendant makes, the government would argue that neither AOL nor NCMEC are government agents and therefore The Fourth Amendment is not implicated.

The filtering process that is conducted by AOL is completely and entirely distinct from the reporting process and requirements that are mandated as well. The search or the IDFP, which was mentioned in the declaration that was filed yesterday on behalf of AOL is not statutorily required, nor statutory inspired.

The filtering process that AOL has to complete or has decided to do on its own has absolutely nothing to do with the statute itself. The only thing that has anything to do with the statute is the reporting process. So I think it's very important to make this distinction between the filtering, which I believe Mr. Watkins repeatedly uses the

phrase "churning," if you will, is not the same thing as the reporting requirements.

The Fourth Amendment would only apply to searches and seizures that are the product of a state action. Today the government learned that there was a -- although not controlling case, but a decision that was issued on a similar motion to suppress relative to AOL.

It was issued by the Southern District of Iowa in the case entitled: United States versus Jeremy R. Stevenson, and Stevenson is S-t-e-v-e-n-s-o-n.

I can just certainly provide the Court with the criminal docket number that I do have on it is 12-cr-0005-r, as in Roger -p as in Paul, -t as in Thomas -JJS, as in Sam; and it's a motion to suppress that I would suggest to the Court was made on very similar arguments by defense in the Stevenson case where they argued that AOL's acting as a government agent, and the Court today issued a ruling denying that motion to suppress indicating that AOL was not acting as a government agent.

Interesting enough as the Court pointed out a few moments ago about the Federal Express, there is a case cited in the Stevenson case that talks about Federal Express agents and whether or not they are considered government agents. In this case, your Honor, I would suggest to the Court that the burden rests with the defendant to establish

that there's a governmental agency that exists among the law enforcement officials and AOL and NCMEC.

THE COURT: Well, don't you overstate it a little to say that there has to be an agency? The cases say that the government may instigate a search, but not necessarily suggesting there has to be anything like a common law agency, does it?

MS. SULLIVAN: No, it doesn't, and I'm not trying to overstate it, and I believe that I use the statement "government agents" in the course of my opposition, and by no means am I trying to overstate what I believe is the appropriate terminology, but in this case I do not -- I suggest to the Court that there is no relationship per se between the government and AOL and NCMEC.

THE COURT: You're using the word "agency" again. One question could be: does the overall structure of the reporting requirements, et cetera, and the support of NCMEC by the government taken as a whole amount to instigation?

MS. SULLIVAN: No, it doesn't, because I would suggest to the Court that simply because there may be a number of shared goals or joint initiatives in which NCMEC and various law enforcement agencies, and to a lesser extent, AOL, have been or currently are involved in that does not mean that the government has instigated this relationship so to speak.

Defense indicates in his -- and argues actually in his motion to suppress that because NCMEC has components that involves different law enforcement agencies and some of them are federal law enforcement agencies that that automatically means that they're working on behalf of the government, and I simply would disagree with that.

I think that's a blanket assertion; and simply because there may be, as I say, shared goals to try to prevent child pornography, that does not mean that they're working on behalf or at the behest or instigation of the government.

In this case, as I state, your Honor, the First Circuit has made clear that it will not find state action simply because the government has a stake in the outcome of the search, and that is addressed in the Silva case which Mr. Watkins cited to and I also cited to it both in my brief and I cite to it right now.

I think that we both are in agreement as to the three-part test of Silva, the First Circuit 2009 case, in order to determine whether a private party has acted as a government agent for Fourth Amendment purposes, you have to look at three things: the extent of the government's role in instigating or participating in the search which the court has used the word appropriately, instigating; it's intent and degree of control it exercises over the search and over the private party; and, third, the extent to which

the private party aims primarily to help the government or to serve its own interests.

In the Declaration of Don Colcolough from AOL that was filed as Document No. 28 in support of the government's opposition it's very clear that AOL is acting for its own internal interests; it has very strong interests, I would suggest to the Court, that it would want to filter out any contraband; in this case, any child pornography from its sites.

It would not want, I would suggest it would not want to be known as an internet service provider that just freelances as a cover for child pornographers so to speak. So I do think it's really important when you review the government's opposition that you also make sure that you have an opportunity to review the Declaration of the AOL Director of Investigations in Cyber Security.

I would also suggest to the Court that a search or seizure conducted by a private party not acting as a government agent is shielded from the Fourth Amendment scrutiny. As the Court is aware, the defendant shoulders the burden of establishing the existence of the agency relationship, and here I would suggest respectfully that the defendant has failed in that particular burden.

The case I've cited, although not controlling, is the Richardson case, and I cited it at various points in my

opposition to the motion to suppress. It's a Fourth Circuit case in 2010 where the court found that a statutorily-inspired record search conducted by AOL did not constitute state action.

I would suggest and I would urge the Court to follow the reasoning in Richardson. There is a mandatory reporting obligation for AOL. And just as in Richardson, here there was no law enforcement agency that specifically asked or requested AOL to search e-mails or images, anything related to the defendant, or provided any information to cause AOL to search e-mails, images, or anything related to the defendant, nor did law enforcement request AOL to aid in their own investigation except through in an ordinary form of compulsory legal process, which would be administrative subpoenas and such.

The statute does not require companies to search affirmatively for child pornography, and here there's no evidence that the government had any involvement whatsoever of AOL's discovery of the suspected child pornography evidence.

I will agree with Mr. Watkins when the Court asked a short while ago about AOL and the process from AOL to NCMEC, I do believe that at some point AOL would have to -- an AOL employee would see the image, detect it as a pattern of suspected child pornography and then at that point -- by its

own standards, and then it would hash the image, and the hash would go into a database and subsequently be translated down to NCMEC, so I do agree with the way that Mr. Watkins described that. I do think that's the way it would have to go but --

THE COURT: So we can call it "the new image" as opposed to "the library image," the creation of the hash value would be a secondary step because there would be recognition prior to that?

MS. SULLIVAN: My understanding is that an AOL employee would at some point have to have eyes on an image or a file or however you want to phrase it, and then it would determine that it would be a pattern of suspected child pornography by AOL standards.

The hash value would then go into a database and ultimately be transferred or translated to NCMEC. That's my understanding. Mr. Watkins indicated or I thought that he indicated that AOL had looked at it, in some form had to look at some image or file before it got down to NCMEC.

THE COURT: I don't think it matters; but if it does matter, we may have to have evidence, further evidence from the affidavit if that's correct.

MS. SULLIVAN: I don't know whether it does or not but I wanted to point that out because the Court did ask defense, so I wanted to give you my understanding. That's

simply why I wanted to do that, your Honor.

Additionally, your Honor, I would suggest to the Court that the affidavit or the declaration of AOL firmly establishes that it was acting on its own initiative and not on anyone else's initiative and for its own good.

And I would distinguish Skinner, which I know Mr. Watkins relies on the Skinner case and I would suggest to the Court that in the Richardson case, as here, the defendant attempts to draw an analogy between the simple reporting requirements of 18 U.S.C. Section 2258A and the regulatory scheme at issue in Skinner.

Unlike the regulatory scheme at issue in Skinner; here, 18 U.S.C. Section 2258A neither directs AOL to actively seek out child pornography evidence, nor prescribes the procedures for doing so. And so I think that's a very important distinction between the Skinner case and our case, because there's no regulation found that was, that was at issue in Skinner that I would suggest can be analyzed or analysisized to this particular case.

In Richardson the court made it very clear about what Skinner did and how it would authorize a search. In Skinner the court considered whether the regulatory scheme imposed by the Federal Railroad Administration for mandatory and permissible drug testing by private railroads implicated the Fourth Amendment.

And the court there found there that the regulations dictated how testing was to be conducted and therefore the Fourth Amendment was triggered. Here there's no dictation by the government of any testing, how it has to be done, any filtering process, that is entirely separate and it is done entirely by AOL at no behest or no request by the government.

So I think that that's a very important distinction between the two. I'd also suggest to the Court that AOL is not pressured to report the CP images; although, there is a statutory requirement that they have to report it if they find what they suspect to be child pornography and there is a significant penalty for their failure to do so, but the reporting piece comes after the detection piece, and that's very, very important.

We don't tell them as part -- as government people that they must go and detect. They do that on their own. They filter it out on their own; but if they filter something and they find it to be suspected or believed to be child pornography, then they're required to report it.

THE COURT: Why would AOL have gone about protecting its separate interests in a different way if it not for the government scheme?

MS. SULLIVAN: Could they have gone about it differently?

THE COURT: Well, yes, could they have, and might they have, I guess would they have; I don't know. The problem is I don't know the answer to that question but just is that a relevant question or is it that suppose, let's put it this way: suppose they designed the scheme in light of the government mandate reporting requirements, would that affect your view?

MS. SULLIVAN: Suppose that they instituted this particular scheme in light of the mandatory regulation?

THE COURT: Their obligations and potential liabilities under the government scheme?

MS. SULLIVAN: I don't know if that would change my view. I say that, your Honor, because in reviewing this declaration it's very clear that they developed and began using their own system several years ago, but I don't want to speculate on behalf of AOL. I'm not trying to put myself in the shoes of AOL of how would they have acted or would they have acted differently but for a regulatory scheme, but what I think is important to point out -- I'm sorry, your Honor.

THE COURT: Go ahead.

MS. SULLIVAN: -- but what I think is important to point out is their own filtering process, however they decide to do it, I don't think I'm in a position to say: well, maybe they would have done it differently if there

was no penalty if they didn't report something.

THE COURT: But would you agree that if they did alter their methods in light of the government scheme that would be a factor that might tend to show enough cooperation with the government?

MS. SULLIVAN: It's a factor that may show. I won't say that it's a factor that would definitively or conclusively show, and the reason that I say that again, your Honor, is because I think it's really important to make sure that we see which came first: filtering is by AOL, however they decide to do it, reporting comes second; and I think that you cannot put them in reverse order or closer in time to one another because of the nature of what we're looking at here.

And towards that point, your Honor, I would suggest to the Court that there's no coercion in the statute itself; there's absolutely nothing that requires AOL or any other internet service provider to detect, which is the critical piece here.

There's a big distinction between their own filtering process and their reporting process; because the reporting process is mandatory, the filtering process is not or the detection process. And so they're completely separate and I think you have to look at it that way.

And I would lastly say in relation to the first

argument that Mr. Watkins has made without belaboring the points of what I have already made in my opposition, but unsubstantiated allegations by the defendant would not be sufficient to meet the defendant's burden of establishing, in this particular case, that either AOL or NCMEC were acting as government agents or that there was state action that was implicated in this case. And I would suggest the information both in the initial motion to suppress and in the response to my opposition that was filed this morning by the defense would not even be sufficient to rise to the level of an evidentiary hearing on that matter with the caveat of the one thing that the Court brought up a few moments ago; and I think for those reasons I think the first argument fails.

The second argument that the defendant makes is the evidence in support of the probable cause, and it fails and I'd suggest that --

THE COURT: But before we get to that, let me just ask you, you're focused mostly on AOL; let me ask you to address NCMEC's role. I mean, it's different; isn't it?

MS. SULLIVAN: It's different. In some ways it certainly is different. It's not an internet service provider; I completely agree with that. It has a separate role; it's distinct, but, again, I would argue with all due respect to defense counsel that NCMEC may share a number of

common goals with members of the law enforcement community and different law enforcement agencies. They may even have joint initiatives, but that does not make them part and parcel of the government.

The defense wants to say, and I would suggest he does say in effect, because there are members that may sit on the Board of Directors of the National Center for Missing and Exploited Children that it makes everybody part and parcel of the government agency; that we all work together, everybody wants to do this.

Well, I would suggest to the Court nobody wants child pornography to be out there; whether or not you're an individual person or you're a member of law enforcement unless you are predator of children or you're a child pornographer.

That does not mean that you are all working together. If an individual's on the street, your Honor, and sees a drug deal going on, and that person on their own initiative contacts 911 to say that I just saw a drug deal go on on such and such a street; there is an identification that I can give you of the suspected suspect, does that mean that that person is now working as a government agent or working because there's state action there because of the fact that they wanted to assist local, state, or federal law enforcement in trying to prevent a crime?

Well, I think you can make a simpler argument. Simply because NCMEC may have testified before Congress, defense puts quotes and quotes and quotes of what the National Center for Missing and Exploited Children have said about what their role is and why they do what they do and how they assist people. It doesn't mean that they're working with the government and that they're necessarily government agents or that there's state action that implicates or triggers The Fourth Amendment, and so I don't agree with the defense on that one.

THE COURT: Well, what about the question of whether the opening or viewing of the files would have sort of been an informal confirmation of the cybertip constitutes an expansion of the AOL service?

MS. SULLIVAN: I don't think it does.

THE COURT: Why not?

MS. SULLIVAN: Because NCMEC, again, has its own responsibilities of why --

THE COURT: No, it's not a question of whether it's acting for the government; that's a separate question. I'm just asking whether looking at the file is an expansion of the -- assuming it was a search, we'll call it a "search," I guess, does it expand the scope of the search?

Let me ask it a different way: if it were a search, would it be an expanded search within the meaning of say

Walters versus the United States?

MS. SULLIVAN: I don't think that it would be. Well, first of all, I don't agree it was a search; but even if it were considered a search, I don't believe it was considered an expanded search.

My understanding, as I said a few moments ago, your Honor, would be that AOL or someone at AOL has to have eyes on the image to at least make or suspect to believe that there was child pornography. It then gets forwarded to NCMEC. NCMEC has its own responsibilities. Part of that would be to open an image of the child of jpg, however you want to describe it, to make its own determination of what it has to do. It also has its own requirements.

If it believes that it's child pornography, then they can certainly send it to the appropriate local law enforcement or state or federal law enforcement, which it did in this case.

I do not believe it's an expansion of the search itself of informational files that it received from AOL, because I don't even think it's a search to begin with, so I don't believe that NCMEC -- there would be search warrant that is required for NCMEC.

THE COURT: Okay. So I think I understand, and that's based on your understanding that somebody's already done the equivalent of the same thing, looked at the file

at AOL? If that were not the case and all they had done was look at the hash value and then it was forwarded to somebody at NCMEC, would you agree that that was expansion of the search?

MS. SULLIVAN: Not necessarily, because they may have their own requirements of how they have to examine the hash value itself; that may be an entirely different step from AOL.

I don't know what the procedure and protocol is and whether they're similar or different, and again I'm not trying to speak for NCMEC other than I'm making the argument that I do not believe it's an expanded search.

I do believe they were completely entitled and appropriate in being able to open the hash value, image the file of what was sent to them from AOL in making its own determination of what it needs to do without being considered part of law enforcement.

THE COURT: Let's move onto the nexus of the staleness.

MS. SULLIVAN: Yes, your Honor. Our second argument again, your Honor, I've outlined my position in my opposition in my brief, and I would specifically suggest to the Court that given the nature of the allegations in this search warrant affidavit and also the well-recognized characteristics of child pornography offenses, the

defendant's argument on the staleness issue fails.

I have pointed out several cases in my opposition that range from approximately three months through four years between the time frames of child pornography being examined or viewed and search warrants being executed where the court has held that the evidence is not stale.

Contrary to the defendant's argument, child pornography cases are different than other cases. They can be kept, maintained, even deleted from a computer, and then be found a significant period of time later.

There's also information in cases and in the affidavit of the trooper that was submitted in support of the probable cause petition to issue the search warrant in this case that talks about how child pornographers can keep certain of their files, where they're keeping it, the storage process, and I think that that's important to point out because this is not like a drug case, this is not like a firearm case.

The defendant just -- defense counsel just said to you his argument on the staleness issue that he believed you need to show there was some criminal activity at that residence on the date.

Well, I absolutely disagree with that because it's very, very clear that there's no bright line rule as to when a fact or a piece of evidence becomes stale. That's the

Morales case that I cited, the First Circuit case, in my opposition. It's a case-by-case basis and existing case law provides guidance with respect to staleness; and as I say, courts have consistently recognized that collectors and traders of child pornography often retain their collections for long periods of time; and, therefore, evidence which may be considered too old in one context is often not considered too old in a child pornography context.

So I would suggest to the Court that information that the crime or information that a crime has been committed is evidence of the offense that would be found at the defendant's residence was clearly supported in the probable cause information that's contained in the trooper's affidavit.

In addition to the cybertip, not only the one at issue but the other ones that were outlined in both the brief -- the motion and the opposition, the trooper includes that information in his affidavit in support of the search warrant. And he also includes and incorporated by reference Sergeant C-a-g-g-i-a-n-o-'-s, Sergeant Caggiano's affidavit. He's the Plaistow, New Hampshire, police officer, your Honor, that submitted an affidavit in support of the search warrant after Mr. Keith delivered the Toshiba laptop to a Staples store for repairs, and they found suspected child pornography on it. They contacted local authorities.

The local authorities reached out to Mr. Keith. He made admissions. All of that, I believe, also supports the probable cause because in the --

THE COURT: Well --

MS. SULLIVAN: I'm sorry.

THE COURT: Trooper Murphy?

MS. SULLIVAN: Trooper Michael Murphy.

THE COURT: He made the affidavit for the search warrant, right?

MS. SULLIVAN: He made the affidavit for the search warrant.

THE COURT: Did he include Caggiano's -- he referred to Caggiano's search warrant; did he include Caggiano's affidavit?

MS. SULLIVAN: One moment, your Honor?

THE COURT: I don't know whether it matters.

MR. WATKINS: I'm almost certain he did.

MS. SULLIVAN: I thought he did, but I know there's a reference in it. I believe he also attached it as well, your Honor. And the information that's in Trooper Murphy's affidavit, there's also specific paragraphs that relate to Staples that he made to the Sergeant.

THE COURT: I found the text. It does say "see attachment," okay.

MS. SULLIVAN: So I just only point that out, your

Honor, because I would suggest there's more than simply the cybertip that's contained in that -- in Trooper Murphy's affidavit in support of the search warrant, and he identifies what that specific cybertip was, and he also explains that it depicts an apparent prepubescent male with an erect penis that was touching the anus of a young child of an unknown gender.

He's very clear of what he believes the suspected child pornography is, including in the description the cybertip and the reference to Sergeant Caggiano's information and the information about that Toshiba.

He also points out in his affidavit that a forensic evaluation and examination was done of the Toshiba, and at one point Mr. Keith is observed -- as a result of this examination there's a photo of him where the computer equipment's in the area of the photograph, and that I believe is also important for the Court's consideration of whether or not there was probable cause in support of his search warrant. Because he bases the information on the fact that there could be other equipment at the house because that equipment is not Toshiba equipment; it had already been taken to Staples by Mr. Keith. It had not been returned to him.

Those piece of equipment, the computers that were depicted in the photos with the defendant in that same

photo were part of the basis for him to ask for a search warrant for that house -- for that home, so I would suggest to the Court that --

THE COURT: Was the photo supplied?

MS. SULLIVAN: I'm sorry?

THE COURT: Was the photo itself supplied?

MS. SULLIVAN: I believe it's just a description and not the photo itself, your Honor. And lastly on that particular argument, and I'm almost finished and I appreciate your time, in the event that the Court finds that there was probable cause lacking or that there was staleness here to justify the issuance of the warrant, I would suggest to the Court that the evidence obtained should not be suppressed under the good faith exception to the warrant requirement which is articulated in the United States versus Leon case.

And for all of those reasons, your Honor, the police officer's reliance on the warrant I would suggest was both reasonable and in good faith, and here the defendant has failed to establish that there was any bad faith on the part or presentation or on the execution of the search warrant; and for those reasons, I would suggest that that second argument fails. And because of the government's position on the first and second argument the defendant has made, I would suggest to the Court that any statements made

by the defendant during and subsequent to the search warrant execution were reasonably obtained and certainly should not be suppressed.

And for those reasons, everything I articulated in my opposition and in the affidavit, the declaration, as well as the three exhibits that were submitted on behalf of the government, I would respectfully ask this Court to deny the defense's motion.

MR. WATKINS: Can I rebut?

THE COURT: Sure.

MR. WATKINS: Your Honor, there is a permissive aspect of the statutory scheme. That's 47 U.S.C. 230, which gives the internet service providers civil liability. So it is not as the government says, simply this mandatory reporting; that that's the only thing that is at issue. I think the combination of those two things is, as I phrased it, the carrot and the stick for the ISP's, and why this is government action.

I don't want to belabor the point. I think NCMEC is clearly an instrumentality, an agent, or instigated by the government. I have not run into this, to be honest, of an ostensibly a nonprofit organization that's written into the statute as identified as a clearinghouse for law enforcement; but not only that, but tasked with specific things that they get to do that the rest of the world

cannot. For example, none of us can possess child pornography; NCMEC can because that is their function is to do this clearinghouse function.

Ms. Sullivan's analysis to somebody walking down the street and seeing a crime and saying, you know, that person should be arrested. Certainly, that is not government action.

What would be government action is if a civilian in the front seat of a cruiser starts saying: hey, I think that guy's suspicious. You know, go search him. If the police officer does that, obviously, that is the Fourth Amendment because it is the government that's doing that. That's the analogy that I think both applies to NCMEC where you have law enforcement individuals sitting in the same room and doing tasks. I mean, the discovery here indicates that it is agents in NCMEC who are making these referrals out to law enforcement, so there is not some kind of bright line there. I simply don't think that the government's going to get anywhere or shouldn't get anywhere with the argument that NCMEC is not a law enforcement instrumentality.

AOL obviously is a closer question. I just wanted to comment a little bit or where I think the Court is going is: would AOL have done things differently?

As I've read the materials that I've included there, that may be hard for the Court to discern that particular

hypothetical, because it sounds like the two things were happening at the same time. And, again, it may be because this particular person at AOL was sitting on both sides of the fence.

It sounds to me at the same time AOL is developing its filtering software it is advocating that everybody should be using this filtering software; they are the most motivating -- one of the moving parties or at least they would describe themselves as on the forefront of this. So at the same time they're developing a software they're lobbying Congress for laws because certainly they don't want to be the ones out on the limb censoring, if you will, or churning e-mails where nobody else has to or nobody else has these.

And I would suggest that's going to -- that's the inference one could draw from the history there, so I think the Court may have some trouble answering that particular question of what would they have done differently because I think they chose to do it in this way because, and do it in conjunction with law enforcement.

Finally, your Honor, as the Court knows, I represented the defendant at the evidentiary hearing in this matter and up until this morning I was still fairly certain that that was the issue. I think that certainly the Court in our argument has convinced me that it should be otherwise as to

the NCMEC issue; that if, indeed, NCMEC is a law enforcement instrumentality and the focus is on whether they expanded the search, I think the Court is quite right that we need to go back to AOL and find out more detail about how they find these particular images.

The reason is, I spoke probably much too quickly when I talked about AOL must have laid eyes on it before. The affidavit does not go that far. What it says is they are not providing hash values from the government.

I don't know where those hash values come from, and it's not clear from the affidavit, and certainly that would be a question that needs to be answered by somebody at AOL. Because I'm not at all confident that any of us can say on the record that someone at AOL has laid eyes on the particular image; certainly, on the image at issue here nobody laid eyes on it. I think we can all agree to that. Whether a year ago or two years ago or three years ago someone saw that image, I simply don't know -- at AOL, I simply don't know. I think that would require some kind of an evidentiary issue, and then an additional issue would be exactly what NCMEC does once they get that, how they go ahead analyzing it because I think even if someone at AOL views it, I think what NCMEC does goes far beyond that particular viewing in identifying it as child porn.

So if the Court believes that those issues are germane

to the answer on my second point on the motion to suppress I do think that perhaps we should schedule a motion to suppress.

Finally, your Honor, I would like the opportunity to at least take a look at the Southern District of Iowa case and see what they have come up with; and if the Court wanted further briefing, I would certainly look into that.

THE COURT: All right. I think it may well be the case, and I want to think about it a little bit, that we need somebody to explain this technical process a little bit more.

I am concerned that there could be variations in what could make a difference to some of these issues, so it might be that we have to have somebody explain the AOL side of it and have somebody explain what the cybertip group at NCMEC does when they test for it, so I don't know if you have any thoughts about the feasibility of --

MS. SULLIVAN: I don't know; I don't agree that it's necessary that we have an evidentiary hearing on the AOL aspect, because regardless of whether or not someone laid eyes on it it's our argument that they weren't working at the behest of the government and I understand that's --

THE COURT: Well, even if that's true, it may have implications for the expansion issue?

MS. SULLIVAN: It may, and I do not know in terms

of, you know, the availability or anything. He's out of state; I don't know what state he's is in, your Honor. When I spoke with him, he was in, I believe, South Carolina, but that was a vacation home so I don't know where he's located.

I certainly can inquire and check and report back to the court clerk if you'd like me to?

THE COURT: Yes, I would for both of them.

MS. SULLIVAN: But I don't have -- I know for NCMEC, I haven't been in contact with anyone from NCMEC myself.

THE COURT: I see. I believe somebody can explain what the process is; I guess it doesn't necessarily have to be someone from the organization itself, okay?

Thank you.

MS. SULLIVAN: Thank you.

THE CLERK: All rise. Court is in recess.

(Whereupon, the proceedings concluded at 4:09 p.m.)

C E R T I F I C A T E

I, Helana E. Kline, a Registered Merit Reporter, Certified Realtime Reporter, and Federal Official Court Reporter of the United States District Court, do hereby certify that the foregoing transcript, from Page 1 to Page 45, constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of the United States of America v. David A. Keith.

/s/ Helana E. Kline July 16, 2012

Helana E. Kline, RMR, CRR

Federal Official Court Reporter